IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

KIMBERLY K. WHYDE, )
 )
 Plaintiff, )
 )
vs. ) Case No. 17-cv-364-JPG-CJP
 )
NANCY A. BERRYHILL, )
Acting Commissioner of Social Security, )
 )
 Defendant.[1] )

## MEMORANDUM and ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff Kimberly K. Whyde seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for DIB on August 5, 2013, and for SSI on August 7, 2013. She alleged a disability onset date of January 31, 2011. (Tr. 227-34.) Plaintiff's application was denied at the initial level and again upon reconsideration. (Tr. 95-122, 125-56.) Plaintiff requested an evidentiary hearing, which Administrative Law Judge (ALJ) Stuart T. Janney conducted on December 15, 2015. (Tr. 40-94.) ALJ Janney ultimately issued an unfavorable decision on January 12, 2016. (Tr. 17-34.) The Appeals Council denied review, rendering the ALJ's decision the final agency decision. (Tr. 1-6.) Plaintiff exhausted her administrative remedies and filed a timely complaint in this Court (Doc. 1).

## Issued Raised by Plaintiff

Plaintiff argues the ALJ erroneously evaluated the medical opinions, improperly assessed plaintiff's credibility, and failed to respond to an objection plaintiff raised in a post-hearing

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. *See* https://www.ssa.gov/agency/commissioner.html (visited Feb. 7, 2017). She is automatically substituted as defendant in this case. *See* Fed. R. Civ. P. 25(d); 42 U.S.C. § 405(g).

memorandum.

## Applicable Legal Standards

To qualify for benefits, a claimant must be "disabled" pursuant to the Social Security Act.[2] The Act defines a "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The physical or mental impairment must result from a medically demonstrable abnormality. 42 U.S.C. § 423(d)(3). Moreover, the impairment must prevent the plaintiff from engaging in significant physical or mental work activity done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations require an ALJ to ask five questions when determining whether a claimant is disabled. The first three questions are simple: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe physical or mental impairment; and (3) whether that impairment meets or is equivalent to one of the listed impairments that the regulations acknowledge to be conclusively disabling. 20 C.F.R. § 404.1520(a)(4); *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). If the answers to these questions are "yes," then the ALJ should find that the claimant is disabled. *Id.*

At times, an ALJ may find that the claimant is unemployed and has a serious impairment, but that the impairment is neither listed in nor equivalent to the impairments in the regulations—failing at step three. If this happens, then the ALJ must ask a fourth question: (4) whether the claimant is able to perform his or her previous work. *Id.* If the claimant is not able to, then the burden shifts to the Commissioner to answer a fifth and final question: (5) whether the claimant is capable of performing

---

[2] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423 *et seq.* and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c *et seq.* and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925, which details medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

2

*any* work within the economy, in light of the claimant's age, education, and work experience. If the claimant cannot, then the ALJ should find the claimant to be disabled. *Id.*; *see also Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

A claimant may appeal the final decision of the Social Security Administration to this Court, but the scope of review here is limited: while the Court must ensure that the ALJ did not make any errors of law, the ALJ's findings of fact are conclusive as long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable person would find sufficient to support a decision. *Weatherbee*, 649 F.3d at 568 (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). The Court takes into account the entire administrative record when reviewing for substantial evidence, but it does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). But even though this judicial review is limited, the Court should not and does not act as a rubber stamp for the Commissioner. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

## The ALJ's Decision

ALJ Janney found plaintiff met the insured status requirements through September 30, 2016, and had not engaged in any substantial gainful activity since January 31, 2011. He opined plaintiff had severe impairments of left knee arthritis; bilateral hip and bilateral sacroiliac joint osteoarthritis; obesity; chronic obstructive pulmonary disease; obstructive sleep apnea; ADHD; chronic schizophrenia and/or schizoaffective disorder (bipolar type); major depressive disorder; bipolar disorder (type I); anxiety; and panic disorder. (Tr. 19.)

The ALJ found plaintiff had the residual functional capacity (RFC) to perform sedentary work with several additional limitations. (Tr. 22.) ALJ also found plaintiff was unable to perform any past relevant work but was not disabled because jobs existed that plaintiff could perform. (Tr. 31-33.)

## Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

**1. Agency Forms**

In her agency forms, plaintiff indicated the following conditions limited her ability to work: chronic depression, migraines, anxiety, fibromyalgia, arthritis, ADD, and bipolar disorder. (Tr. 253.) Plaintiff had a twelfth-grade education and throughout the previous fifteen years worked as a case manager assistant at Murphysboro Health Center, performed clerical work at Jackson Vision and Laser Center, and was a pharmacy technician at Kroger Pharmacy. (Tr. 255.)

Plaintiff stated that she woke up around four to six a.m. because she could not sleep due to pain. She took her medication upon waking up and could barely move or walk. She had difficulty dressing, bathing, and using the toilet. Plaintiff was able to prepare sandwiches and frozen dinners. She could complete some cleaning, wash laundry, and care for her animals. She performed these chores for four to six hours a day, once or twice per week. Her daughter helped her on bad days. Plaintiff grocery shopped on a weekly basis. She could only lift about ten pounds and she experienced pain with squatting, bending, and kneeling. She could only stand for a short period, and even sedentary tasks were difficult. Climbing stairs was almost impossible for plaintiff. She could walk about fifty feet before she needed to rest for ten to fifteen minutes. She could pay attention for about ten minutes and did not follow instructions well. (Tr. 277-84.)

Plaintiff had difficulty opening lids because she had no strength in her arms, wrists, or hands. She had problems sorting and filing papers because she easily lost concentration. Plaintiff also lost her train of thought and confused numbers when she dialed the phone. Weakness in her arms and upper body made it difficult for her to carry bags of groceries, baskets of laundry, or trash bags. She also had

problems reaching overhead because she got dizzy and light-headed. (Tr. 286.)

Plaintiff's depression left her feeling hopeless and helpless. Her anxiety caused her stress and made it difficult to get along with others. Fibromyalgia and arthritis woke her up at night. (Tr. 289-90.)

In disability reports from January and August 2014, plaintiff stated all of her conditions were more severe. (Tr. 304, 337.)

### 2. Evidentiary Hearing

ALJ Janney presided over an evidentiary hearing on December 17, 2015, at which plaintiff was represented by counsel.

Plaintiff had a driver's license and was able to drive for short distances. Plaintiff weighed two-hundred-and-thirty pounds and was five-foot, nine-inches tall. She had a gastric sleeve and planned to undergo a bypass procedure. Plaintiff lost seventy pounds since getting the gastric sleeve, which alleviated pain in her back. (Tr. 46-48.)

Plaintiff last worked at a security agency for about three months but was laid off because the agency hired too many employees. Plaintiff did not believe she could have continued to perform her duties, anyways, because of her conditions. Plaintiff also worked at Shawnee Health Service and Development Corporation as a case manager until her position was phased out. She did not believe she could continue her duties, however, due to anxiety. She had problems getting along with coworkers and did not meet her superiors' expectations. She started having panic attacks about once per week beginning in 2011. Her chest tightened, her heart beat fast, and she cried. (Tr. 49-56.)

Plaintiff's anxiety progressed since 2011. She could not go shopping without her mother and avoided restaurants, movies, and places with crowds of people. Groups of about six people triggered her anxiety. (Tr. 56-58.)

Plaintiff tried to walk when she grocery shopped but used a motorized cart about eighty percent of

5

the time. When she did walk, plaintiff had to rest for fifteen minutes at a time. She could lift a gallon of milk but nothing heavier. (Tr. 58-60.)

Plaintiff underwent electroconvulsive therapy several years before the hearing. Afterwards, she needed lists to remind her to complete tasks. (Tr. 60-61.)

Plaintiff could stand for about fifteen minutes and sit for an hour. She frequently repositioned herself when sitting. (Tr. 62.)

About three days each week, plaintiff's pain prevented her from getting out of bed. On other days, plaintiff took her medication immediately upon waking up, which caused her to be "scatterbrained," confused, and tired. She then tried to do chores but they took her much longer than they should. Plaintiff's daughter helped her wash laundry and cook. Her daughter also cared for the animals in the home. Plaintiff could not vacuum because of the pushing and pulling required. (Tr. 62-66, 68-69.)

Plaintiff found the three steps leading to her home difficult to navigate. Plaintiff fell on her face a couple of weeks before the hearing and tore all of the tendons and muscles in her legs and hip. (Tr. 67.)

A medical record from July 27, 2015, states plaintiff walked for two miles each day. Plaintiff denied being able to walk two miles at that time because of a fractured pelvis. She did not know why the note stated she could walk for that long. (Tr. 70.)

Plaintiff attended court-ordered anger management after an altercation with her neighbor in which she was accused of purposely hitting her neighbor's car. (Tr. 71.)

Plaintiff's doctor recommended support groups and nutritional counseling following her gastric sleeve surgery. She stopped attending counseling because she did not feel well. Plaintiff's leg swelling was better but she wore a compression sleeves sometimes. (Tr. 72-74.)

Dr. Minkus, a vocational expert (VE), testified at the hearing as well. The ALJ asked the VE to consider a hypothetical individual with the ultimate RFC finding: the ability to perform sedentary

work, except she could never climb ramps, stairs, ladders, ropes, and scaffolding. The individual could only occasionally balance, stoop, kneel, crouch, and crawl and should avoid concentrated exposure to workplace hazards. The individual could understand, remember, and carry out simple one- or two-step instructions or tasks at a consistent pace over the course of a workday but could not do so if the tasks were complex. The individual should work in a task or an object oriented setting as opposed to a service-oriented setting where there would be occasional work-related interaction with coworkers, supervisors, and the public. (Tr. 79.)

The VE opined that the individual would not be able to perform plaintiff's past relevant work. However, other jobs existed in the national economy that plaintiff could perform. (Tr. 85-86.)

### 3. Medical Records

Plaintiff regularly presented to Rural Health Care, Inc. from March 24, 2009, through July 14, 2011. Her treatment provider consistently noted normal thought processes and perception, unremarkable though content, and a pleasant and/or cooperative appearance. Plaintiff received diagnoses of bipolar disorder and generalized anxiety disorder. Her associated symptoms included depression, low energy, decreased interest, mood lability, nervousness, anxiety, an inability to concentrate, a pessimistic mood, and difficulty sleeping. Plaintiff's GAF score ranged from 55-75. She was prescribed a combination of Prozac, Abilify, Cymbalta, Xanax, Seroquel, Trazadone, and Toradol. (Tr. 411-44, 466-77.)

Plaintiff treated with Murphysboro Health Center from February 2010 through September 2015. Dr. Clare Fadden was plaintiff's primary care physician, but she also saw physician assistants and other doctors. Her diagnoses included depression, anxiety, obesity, insomnia, migraines, fibromyalgia, chronic obstructive pulmonary disease (COPD), attention deficit disorder (ADD), gastroesophageal reflux disease (GERD), myalgia, arthralgia, tendonitis, hyperlipidemia, degenerative disc disease, anemia, cellulitis, edema, and a foot fracture. She reported her migraines were related to work and

family stressors, and she was prescribed Toradol, Phenergen, Zofran, and Topamax. (Tr. 494, 544, 561, 562.) Dr. Fadden prescribed plaintiff Focalin and Adderall for ADD, Crestor for hyperlipidemia, Dexilant for GERD, Metformin for obesity, Norco for arthropathy, and Dulera, Keflex, prednisone, and albuterol for COPD. (Tr. 541, 545, 571, 715, 763, 740, 894.) Dr. Fadden treated plaintiff's insomnia with Trazadone and Ativan and prescribed Lyrica, Neurontin, Cymbalta, and Arthrotec for her fibromyalgia. (Tr. 498, 546, 727.) Plaintiff was prescribed Xanax, Cymbalta, Abilify, Lamictal, Viibryd, and Latuda at various points for depression. (Tr. 494, 509, 500, 497, 694.) Plaintiff reported that medication did not help her depression. (Tr. 665.) Throughout this period, plaintiff complained of increased pressure from work, mood swings, hives, edema in her lower extremities, nausea, fatigue, body aches, and pain all over. (Tr. 495, 540, 559, 1080.)

Plaintiff complained of pain in her left foot following a fall in October 2010. Images of her foot were normal. (Tr. 584.) In July 2011, plaintiff complained of left forearm pain and indicated she could not lift a cup of coffee or laundry without pain. (Tr. 513.) Dr. Fadden noted plaintiff's ADD was stable. (Tr. 1090.) In September 2011, plaintiff noted an increase in stress and a burning feeling in her abdomen. (Tr. 1087.) In October 2011, plaintiff complained of right hip pain that radiated up her back. The pain began two weeks prior and she had difficulty walking. (Tr. 507.) Images of her right hip were unremarkable. (Tr. 537.) Plaintiff was prescribed Percocet and Xanax. (Tr. 507.) In November 2011, plaintiff was prescribed Neurontin and Percocet for myalgia and fatigue and was instructed to undergo a sleep study. (Tr. 504.) On December 2, 2011, plaintiff reported an increase in pain. She stated she could not get off the couch. She had bilateral arm pain and could not hold a cup of coffee. The pain began six months prior. Plaintiff was prescribed Norco. (Tr. 501.) On December 9, 2011, plaintiff complained of joint and muscle pain, and pain in her right shoulder and elbow, knees, and hips. She was diagnosed with arthralgia and prescribed physical therapy/aquatherapy as well as a formalized exercise program. (Tr. 500.) On December 21, 2011, plaintiff complained of right foot

8

pain. The treatment provider prescribed prednisone and recommended injections. (Tr. 498.)

On January 17, 2012, plaintiff told Dr. Fadden her depression prevented her from doing or caring about anything. She slept and ate all of the time but felt terrible. (Tr. 1071.) On January 19, 2012, plaintiff told Dr. Fadden she could not get off the couch due to depression, illness, and fatigue. (Tr. 1070.) On April 2, 2012, Dr. Fadden stated plaintiff's depression was stable. (Tr. 1066.) On April 19, 2012, plaintiff reported edema in her ankles. (Tr. 716.) On May 1, 2012, Dr. Fadden noted that plaintiff's ADD was stable. (Tr. 1064.) On May 14, 2012, plaintiff saw Dr. Fadden and reported hives that lasted for three days. She instructed plaintiff to take Benadryl. (Tr. 713.) On June 1, 2012, plaintiff told Dr. Fadden that Dr. Chandler called the police on her. She said Dr. Chandler never spent over two minutes with her and she was not going back to see him. (Tr. 712.) On August 3, 2012, plaintiff complained of severe fatigue. Dr. Fadden referred her to a sleep study and a neurologist. (Tr. 1058.)

Plaintiff underwent a sleep study on August 27, 2012, which demonstrated obstructive sleep apnea. Plaintiff was instructed to participate in a CPAP trial and lose weight. (Tr. 535.)

In October 2012, plaintiff followed up with Murphysboro Health Center and was prescribed Medrol for pain in her arms and knees. (Tr. 705.) Dr. Fadden administered injections in plaintiff's left knee. (Tr. 1053.) In September 2012, plaintiff presented to Murphysboro Health Center and complained of lower back pain. She was prescribed an anti-inflammatory. (Tr. 1056.)

Plaintiff participated in a CPAP trial on September 6, 2012. She was recommended a CPAP and heated humidification. (Tr. 531-33.)

In December 2012, plaintiff followed up with Dr. Fadden and complained of edema in her legs. Dr. Fadden prescribed Lasix. (Tr. 702.) In February 2013, plaintiff complained of left foot pain that began two weeks prior. She thought she had a fracture below her ankle, which caused shooting pain when she walked. She was instructed to wear a boot. (Tr. 698.) On March 8, 2013, plaintiff indicated

9

she was using crutches for foot pain. (Tr. 696.)

X-rays of plaintiff's left foot from March 11, 2013 showed no evidence of acute osseous abnormality or fracture. There were apathic changes about the calcaneus. (Tr. 528.)

Plaintiff followed up with Dr. Fadden on May 9, 2013, and complained her depression was worsening. She stated she was anxious, fearful, and easily startled; she had difficulty concentrating, falling asleep, and staying asleep. She also experienced excessive worrying, fatigue, and invulnerability. Depression was associated with chronic pain, headaches, irritability, nausea, sweating, and weight gain. Conflict and stress aggravated her depression. Plaintiff also complained of pain in her joints and legs. Her fibromyalgia was constant and it fluctuated. She felt an aching, burning, and throbbing pain that was aggravated by bending, climbing stairs, lifting, movement, sitting, walking, and standing. Over-the-counter medicines and a hot bath relieved her pain. Associated symptoms included difficulty sleeping, limping, and spasms. (Tr. 685-89.)

In June 2013, plaintiff reported worsening insomnia. Her depression improved from her initial symptoms but she had difficulty functioning. (Tr. 664-68.) Plaintiff also presented to Dr. Fadden with bilateral foot and ankle edema. She was positive for back and joint pain and joint swelling. Dr. Fadden recommended compression stockings. (Tr. 660-63.)

In July 2013, Dr. Fadden noted plaintiff's depression was "fairly controlled." Plaintiff had compulsive thoughts, decreased need for sleep, a depressed mood, difficulty concentrating, difficulty falling and staying asleep, and diminished interest or pleasure; she was easily startled and worried excessively. She also experienced fatigue, guilt, poor judgment, and racing thoughts. Plaintiff's depression was aggravated by conflicts, stress, lack of sleep, and social interactions. (Tr. 655.)

State agency consultant Dr. Adrian Feinerman examined plaintiff in November 2013. Plaintiff complained of decreased memory since 2007, when she started electroshock therapy for depression. Plaintiff stated she had depression since childhood and could not interact with coworkers or

10

supervisors. She also complained of headaches since she was seventeen, which occurred once a week and could last all day. Plaintiff also stated she was diagnosed with fibromyalgia five years before. She complained of pain in her ankles, knees, and feet due to degenerative joint disease. Sha also complained of shortness of breath. On examination, plaintiff was able to sit, stand, walk, hear, speak, lift, carry, and handle objects. Dr. Feinerman diagnosed her with degenerative joint disease. (Tr. 603-15.)

Plaintiff underwent a mental status exam in November 2014. She stated she had residential psychiatric treatment, electroshock therapy, and multiple antidepressant and anti-anxiety agents. She attended outpatient counseling for several years and had ongoing symptoms of depression and anxiety. Plaintiff reportedly had a panic attack while waiting for the evaluation. Dr. James S. Peterson diagnosed plaintiff with major depressive disorder, recurrent with mixed features, and panic disorder. (Tr. 618-21.)

In November 2013, plaintiff presented to Dr. Fadden and described her arthralgia as occasional and fluctuating. Bending, climbing stairs, lifting, and moving aggravated her pain. Her ADD was reportedly stable on medication. (Tr. 891-95.)

In December 2013, Dr. Fadden started plaintiff on ferrous sulfate for anemia. (Tr. 770-74.) Plaintiff told Dr. Fadden her depression medications were not working. She reported diminished interest and pleasure and excessive worrying. (Tr. 765-69.)

Plaintiff began receiving psychiatric care at Shawnee Health Services and Development in January 2014. Plaintiff reported terrible anxiety and panic attacks. Her Xanax was not helping. Plaintiff described a "boiling" feeling and an urge to scream, pass out, or get mad. Her mood was depressed, anxious, and irritable. The psychiatrist diagnosed plaintiff with bipolar disorder, NOS and gave her a sample of Abilify and Latuda. The treatment provider also decreased plaintiff's dosages of Abilify, Xanax, and Adderal and continued her Effexor. Shawnee Health Service and Development began

prescribing all psychiatric medications. (Tr. 799-800.) Plaintiff's psychiatrist recommended a sleep study. Plaintiff indicated she was unable to pursue treatment after her last sleep study due to insurance problems. (Tr. 797-98.)

Plaintiff followed up with Dr. Fadden in January 2014 and stated her bipolar disorder and ADD improved. (Tr. 760-64.)

In February 2014, plaintiff followed up with her psychiatrist and stated the Latuda made her sleepy. She felt less agitated, and her depression was somewhat improved. (Tr. 795.)

Plaintiff presented to Murphysboro Health Center in February 2014. A physician assistant advised plaintiff to discuss her myalgia medications with her psychiatrist. He also referred plaintiff to a neurologist for an evaluation. (Tr.756-59.) Dr. Fadden also examined plaintiff in February 2014 and prescribed her amitryptiline for generalized pain and neuropathy. (Tr.751-55.)

Dr. Chandra at Shawnee Health Services and Development evaluated plaintiff in February 2014. He noted plaintiff did not appear depressed or psychotic. Plaintiff stated she was doing better on Abilify. He diagnosed plaintiff with schizoaffective disorder, continued plaintiff's prescriptions for Abilify, Xanax, and Effexor, and discontinued plaintiff's Latuda. (Tr. 790.) Plaintiff followed up with Dr. Chandra in March 2014. He decreased her dosage of Xanax and continued her other medications. Dr. Chandra noted a diagnosis of Alopecia. (Tr. 788-89.)

Also in March 2014, Dr. Fadden arranged iron infusion for plaintiff's anemia. Plaintiff stated her depression and ADD were worse. (Tr. 747-50.)

In April 2014, plaintiff told Dr. Chandra she was still anxious. Her mood appeared depressed and anxious. Her Alopecia improved. Dr. Chandra prescribed Klonopin and Prozac, and decreased the dosages of Xanax and Effexor. (Tr. 786-87.)

In April 2014, Dr. Fadden noted plaintiff's anemia was "much improved." (Tr. 742-46.)

Plaintiff followed up with Dr. Chandra in May 2014. She was doing well on her medicine. A

mental status examination demonstrated she was alert and oriented and did not appear depressed, suicidal, or psychotic. Plaintiff's insight and judgment were intact. Dr. Chandra continued plaintiff's Klonopin, Prozac, and Abilify. (Tr. 781.)

In May 2014, Dr. Fadden assessed plaintiff with degenerative disc disease. (Tr. 733.) Plaintiff presented to Murphysboro Health Clinic on June 3, 2014 with swelling, redness, and tenderness in her legs. She was diagnosed with cellulitis and venous stasis dermatitis and received a prescription for Keflex. (Tr. 729-32.) Plaintiff followed up with Dr. Todd Smith at Murphysboro Health Center in June 2014. She reported moderate cellulitis in her legs. She took antibiotics but was still experiencing redness and swelling. Plaintiff also reported moderate symptoms associated with her gastric sleeve. (Tr. 725-28.) In July 2014, plaintiff presented to Dr. Fadden with worsening edema in her lower extremities. Dr. Fadden increased plaintiff's Lasix. (Tr. 826-30.) In August 2014, plaintiff told Dr. Fadden she had left knee pain with associated symptoms of joint instability, popping, and swelling. Dr. Fadden administered joint injections. (Tr. 813-16.) In December 2014, plaintiff reported dizziness, haziness, and nausea associated with her medications. (Tr. 1263.) She was doing a "little better" with her fibromyalgia. (Tr. 1268.)

In July, October, and December 2014, plaintiff followed up with Dr. Chandra. She had undergone bypass surgery and seemed to be doing well with it. She reported her medications were working and she was not having any problems or difficulties. She was alert and oriented and did not appear to be depressed, suicidal, or psychotic. Her insight and judgment were intact. (Tr. 1136-42.) Plaintiff followed up with Dr. Chandra in January, March, April, June, July, August, September, and November 2015. She was, again, alert and oriented and did not appear to be depressed, suicidal, or psychotic. Her insight and judgment were intact. (Tr. 1122-35.) In April 2015, plaintiff complained of increased stress and was very tearful at the appointment. (Tr. 1131.) In June 2015, she stated she was having a lot of problems with depression and was tearful at this examination as well. (Tr. 1129.) In September

2015, plaintiff reported worsening depression. She was court-ordered to attend anger management following an altercation (Tr. 1114-16.)

In January 2015, plaintiff presented to Dr. Fadden with a depressed mood and feelings of guilt. She indicated she was very depressed. (Tr. 1255-58.) In March 2015, plaintiff told Dr. Fadden she was doing better in regards to ADD. Her back pain was "doing well." (Tr. 1239-43.) Plaintiff followed up with Dr. Fadden in April 2015. She was doing well on ADD medications. Her back pain was improving, but standing and twisting aggravated her pain. (Tr. 1228-32.) Plaintiff also complained of left knee pain that occurred constantly and was aggravated by climbing stairs. An MRI of plaintiff's left knee showed arthritis. (Tr. 1233-38.) Dr. Fadden diagnosed plaintiff with sciatica in June 2015. Plaintiff also complained of fatigue. Dr. Fadden ordered physical therapy. (Tr. 1211-15.) In July 2015, plaintiff reported hip pain that radiated to her entire left leg. Dr. Fadden ordered an MRI of plaintiff's lumbar spine and a CT of her hip. The hip CT showed an ill-defined density in the left sacral ala with the possibility of a fracture line, and mild osteoarthritic changes in her bilateral hip and sacroiliac joints. Dr. Fadden later opined there was a small fracture in her hip. Plaintiff stated she was trying to walk two miles a day even though it was painful due to her pelvis. The MRI of the lumbar spine showed a partially visualized low T1 and intermediate to high T2-weighted marrow signal involving the sacral ala on the left; neural foraminal narrowing that was moderate-to-severe at L4/L5 on the left; moderate narrowing at L3/L4, bilaterally; moderate narrowing at L4/L5 on the right; spinal canal narrowing that was mild-to-moderate at L3/L4; grade 1 anterior listhesis of L3 on L4; and red marrow reconversion that indicated a hypoxic state of the body with etiology considerations including smoking, obesity, and anemia. (Tr. 1202-10, 1298-301.) In August 2015, plaintiff presented to Dr. Fadden and stated she was doing well with her ADD medications. She indicated musculoskeletal pain. (Tr. 1194-1201.) Plaintiff followed up with Dr. Fadden in September 2015 and reported worsening anxiety. (Tr. 1184-93.)

14

Plaintiff underwent a lap sleeve gastrectomy in October 2014. She received post-operative care from a nurse practitioner at SIH Medical Group Bariatric and General Surgery from November 2014 through October 2015. Plaintiff did well post-operatively. The nurse practitioner recommended that plaintiff attend mandatory support group meetings and follow an exercise regime for weight loss. In August 2015, plaintiff indicated she had not attended any meetings and had not seen her dietician since her three-month post-operative visit. Throughout post-operative treatment, plaintiff was assessed with a diaphragmatic hernia, nausea, vomiting, dysphagia, anxiety, sleep apnea, and GERD. (Tr. 1294-97, 1306-07, 1310-18.)

In November 2015, Dr. Fadden completed a form entitled "Medical Opinion Re: Ability to Do Work-Related Activities (Physical)." Dr. Fadden opined plaintiff could lift and carry less than ten pounds occasionally and frequently; stand and walk less than two hours during an eight-hour day; sit for less than two hours during an eight-hour day; sit for thirty minutes before changing positions; stand for fifteen minutes before changing positions; and walk around every twenty minutes for twenty minutes. Plaintiff needed to shift at will from sitting and standing and lie down at unpredictable intervals during an eight-hour day. Plaintiff could never crouch or climb stairs and ladders. She could occasionally twist and bend. She could not reach, feel, or perform fine or gross manipulations. Plaintiff was also limited in her ability to kneel, balance, and crawl. Her impairments would frequently interfere with her attention and concentration in performing simple work-related tasks. Plaintiff's impairments would cause her to be absent from work more than four days per month. These limitations began in 2010. Dr. Fadden based her opinions on plaintiff's vertigo, nausea, migraines, dizziness, arthritis, and severe fibromyalgia. (Tr. 1096-97.)

Dr. Fadden also completed a Mental Health Questionnaire. She listed plaintiff's diagnoses as depression with bipolar disorder and anxiety. She was markedly limited in activities of daily living and extremely limited in maintaining social functioning; concentration, persistence, or pace; and

episodes of deterioration or decompensation in work or work-like settings, which caused withdrawal from that situation or exacerbation of signs or symptoms. Dr. Fadden opined plaintiff's symptoms from depression and anxiety caused migraine headaches. (Tr. 1099-1101.)

### Analysis

Plaintiff challenges the ALJ's decision on several bases, including that the ALJ erroneously evaluated the opinion of her treating physician. The Social Security Regulations (SSR) require an ALJ to afford controlling weight to a treating source's opinion as long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527. Otherwise, the ALJ must identify "good reasons" for rejecting the opinion and assess it against the following factors: (1) the length of treatment; (2) the nature and extent of the treatment relationship; (3) the supportability of the medical opinion; (4) the consistency of the opinion with the record as a whole; and (5) the physician's specialization. *Id.*

Dr. Clare Fadden was plaintiff's primary care physician during the relevant period, which spans roughly five years. Plaintiff followed up with Dr. Fadden on a near monthly basis. Dr. Fadden completed a physical assessment of plaintiff in November 2015 and opined plaintiff could carry only less than ten pounds, stand and walk for less than two hours in an eight-hour workday, and sit for less than two hours in an eight-hour workday. Dr. Fadden imposed several other work-related restrictions on plaintiff as well. Dr. Fadden also assessed plaintiff's mental state in November 2015. She opined plaintiff was markedly limited in activities of daily living and extremely limited in maintaining social functioning; concentration, persistence, or pace; and extremely limited by episodes of deterioration or decompensation in work or work-like settings, which caused withdrawal from that situation or exacerbation of signs or symptoms.

The ALJ opined that Dr. Fadden's opinions were "extremely inconsistent with the record as a

whole and with Dr. Fadden's own underlying signs and findings." The ALJ bolstered his assessment by pointing to "mildly abnormal findings" in mental status examinations, Dr. Fadden's findings of stability and improvement, and "essentially normal physical findings . . ."

Substantial evidence does not support this explanation. An ALJ cannot logically equate a stable or improving condition with an ability to work. The "key" to a non-disability determination is not whether a claimant's condition is stable or improving, "but whether they have improved enough to meet the legal criteria of not being classified as disabled." *Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014).

The ALJ's emphasis on the lack of physical findings in the record is also misplaced; plaintiff primarily complained of chronic pain, which a physical examination cannot necessarily measure. "Indeed, in certain situations, pain alone can be disabling, even when its existence is unsupported by objective evidence." *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004). It is, therefore, not logical to fault Dr. Fadden's opinion because physical findings did not substantiate plaintiff's complaints of pain from conditions such as fibromyalgia and depression.

Even if the ALJ properly afforded Dr. Fadden's opinion less-than controlling weight, he erred in simply rejecting the opinion thereafter. "A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected." SSR 96-2p, 1996 WL 374188, at *1 (July 2, 1996).[3] Rather, the ALJ must apply the factors from 20 C.F.R. § 404.1527(d), which are listed above. "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p, 1996 WL 374188, at *4. Here, the ALJ did not explain what weight he afforded Dr. Fadden's opinions at all. "[W]here the Commissioner's decision lacks evidentiary support or is so poorly

---

[3] The Social Security Commissioner rescinded the 1996 version of SSR 96-2p for all claims filed on or after March 27, 2017. SSR 96-2p, 2017 WL 3928297, at *1 (Apr. 6, 2017). Plaintiff filed her claim on July 31, 2013, and, therefore, the ruling is still applicable.

17

articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Because remand is warranted on this point, alone, it is unnecessary to address plaintiff's remaining arguments.

### Conclusion

The Commissioner's final decision denying plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**
**DATE: February 23, 2018**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**
